**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

**DANIEL R. CLEMANS** **PLAINTIFF**

**v.** **CIVIL ACTION NO. 3:24-CV-00334-JHM**

**J. SCARBOROUGH *et al*.** **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56 filed by both *pro se* Plaintiff, Daniel R. Clemans, (DN 98) ("Plaintiff's MSJ") and Defendants Brandon Finch, Amber Brown, Rebecca Webster, and Meade County. (DN 106) ("Defendants' MSJ"). With regard to Plaintiff's MSJ, Defendants have filed a response (DN 107), and Plaintiff failed to file a reply. With regard to Defendants' MSJ, Plaintiff has filed a response (DN 109), Defendants filed a reply (DN 112), and Plaintiff filed a sur-reply. (DN 115). Both Plaintiff's MSJ and Defendants' MSJ stand fully briefed and ripe for decision; accordingly, the Court will adjudicate both motions in this memorandum opinion and order.

**I.**

Plaintiff was incarcerated at the Meade County Detention Center ("MCDC") beginning on January 12, 2022. (DN 11, PageID #: 52). He remained a pretrial detainee until January 26, 2024, when he was convicted, and he remained at MCDC as a convicted prisoner until his transfer to Roederer Correctional Complex on July 18, 2024. (*Id.*). Following initial review and two amended complaints the claims remaining in this action are: (i) First Amendment legal-mail claims against Defendants Brandon Finch and Rebecca Webster; (ii) a Fourteenth Amendment deliberate-indifference claim against Defendant Amber Brown regarding Plaintiff's hernia; (iii) a Fourteenth Amendment deliberate-indifference claim against Brown regarding Plaintiff's mental-health

needs; (iv) First Amendment free-exercise and Religious Land Use and Institutionalized Persons Act ("RLUIPA") claims against Finch; and (v) a failure-to-train claim against Meade County. (*Id.*, PageID #: 56-66; DN 25, PageID #: 171; DN 36, PageID #: 232). Both Plaintiff and Defendants have moved for summary judgment on all counts. (DNs 98, 106).

**II.**

Before the Court may grant a motion for summary judgment, it must find that there is "no genuine dispute as to any material fact" and that the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-movant must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

The fact that a plaintiff is *pro se* does not lessen his or her obligations under Rule 56. "The liberal treatment of *pro se* pleadings does not require the lenient treatment of substantive law, and the liberal standards that apply at the pleading stage do not apply after a case has progressed to the summary judgment stage." *Johnson v. Stewart*, No. 08-1521, 2010 U.S. App. LEXIS 27051, at *6-7 (6th Cir. May 5, 2010) (citations omitted). When opposing summary judgment, a party cannot rely on allegations or denials in unsworn filings and a party's "status as a *pro se* litigant does not alter" its burden of showing a genuine issue for trial. *Viergutz v. Lucent Techs., Inc.*, F. App'x 482, 485 (6th Cir. 2010) (citation omitted). Yet statements in a verified complaint that are based on personal knowledge may function as the equivalent of affidavit statements for purposes of summary judgment. *Weberg v. Franks*, 229 F.3d 514, 526 n.13 (6th Cir. 2000); *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992).

## III.

### *A. Defendant Amber Brown*

#### *1. Fourteenth Amendment Deliberate-Indifference Hernia Claim*

Plaintiff maintains that Brown, a Licensed Practical Nurse, ignored a painful hernia throughout his incarceration. (DN 1, PageID #: 4). Brown's interrogatory answers acknowledge that Plaintiff reported during booking that he had a hernia and submitted a February 18, 2022, request to speak with a doctor about the condition. (DN 98-3, PageID #: 561-62). Plaintiff provides that APRN Washington examined visible lumps on his abdomen on February 23, 2022, while Brown was present, identified the lumps as a hiatal or inguinal hernia, and instructed Plaintiff to report worsening symptoms. (DN 98-1, PageID #: 540-42). Plaintiff contends that Brown thereafter provided no examination, follow-up care, or hernia support and denied supplements that his mother attempted to provide. (*Id.*, PageID #: 540-42; DN 98-6, PageID #: 589). Plaintiff

further asserts that, after his transfer from the MCDC, Department of Corrections personnel diagnosed both hiatal and inguinal hernias, provided a hernia truss, and began considering surgery. (DN 98-1, PageID #: 541-42).

Brown disputes Plaintiff's account and characterizes the condition during Plaintiff's MCDC incarceration as self-reported rather than medically diagnosed. She avers that the Baptist Health Hardin records she obtained, including a January 11, 2022, chest x-ray, contained no hernia diagnosis. (DN 98-3, PageID #: 561-63). Brown nevertheless avers that she obtained those records, placed Plaintiff on the medical provider's list, and arranged for Washington to see him on February 23, 2022. (*Id.*, PageID #: 562). Brown also relies on medical request records reflecting that staff responded to Plaintiff's complaints, offered over-the-counter pain medication, and offered to place him on the APRN's list. (DN 98-4, PageID #: 568-77). Brown maintains that Plaintiff has produced no medical record or provider testimony showing that her conduct worsened a hernia or exposed him to a substantial risk of serious harm. (DN 106, PageID #: 701-02).

*2. Fourteenth Amendment Deliberate-Indifference Mental-Health Claim*

Plaintiff alleges that Brown was deliberately-indifferent to his mental-health needs. He maintains that Brown altered his Prozac dosage without an adequate evaluation, required him to take the medication at a time that caused nausea and other side effects, refused his request to move the medication to the evening cart, and never arranged for him to see a mental-health professional. (DN 98-1, PageID #: 544-47). Theresa Crouch, Plaintiff's mother, avers that Plaintiff called her while "freaking out" after changes to his medication and that jail staff provided him no meaningful mental-health assistance. (DN 98-6, PageID #: 589). Plaintiff relies on Brown's acknowledgment that no mental-health professional saw him at MCDC and maintains that the absence of an

evaluation was particularly serious because Brown knew at booking that he suffered from anxiety and was taking Prozac. (DN 98-3, PageID #: 564; DN 98-5, PageID #: 581-82).

Brown disputes Plaintiff's description of his mental-health treatment. She avers that she administered medication ordered by Washington and that the material dosage changes occurred at Plaintiff's request contending that Plaintiff asked to reduce his Prozac dosage from 60 milligrams to 40 milligrams in August 2022 and later asked to restore the 60-milligram dosage in December 2022 because the lower dose was less effective. (DN 98-5, PageID #: 579). Brown further avers that Plaintiff's July 2023 request to move the medication to the evening cart was not denied; rather, staff advised him that the medication was recommended in the morning because it could cause insomnia, and Plaintiff did not renew the request after receiving that information. (*Id.*, PageID #: 579-80). Although Brown acknowledges that Plaintiff did not see a mental-health professional, she avers that he never requested one and did not report mental-health concerns during his visits with Washington. (*Id.*, PageID #: 581-82).

*B. Defendant Brandon Finch*

*1. First Amendment Legal-Mail Claim*

Plaintiff alleges that Finch repeatedly opened legal mail outside Plaintiff's presence, delayed or misplaced incoming and outgoing court mail, and prevented Plaintiff from obtaining copies and notarizations needed for court filings. (DN 98-1, PageID #: 550-53). In a January 18, 2023, grievance, Plaintiff alleged that a letter postmarked January 12 was not delivered until January 17, after the hearing discussed in the letter, and that the envelope appeared to have been opened and taped shut. (DN 98-9, PageID #: 609). Plaintiff also submitted requests and grievances asserting that Finch refused or delayed copies of proposed court filings and denied access to the in-house notary. (*Id.*, PageID #: 610-12, 615). Tyler Petty, a fellow inmate, avers that he saw

Finch deliver Plaintiff's legal mail already opened and heard Plaintiff question Finch about mail that was missing and later found, while Donnie Allen, another inmate, and Crouch similarly aver that Finch refused copies or notarizations. (DN 98-6, PageID #: 586-89).

Finch denies opening or losing any of Plaintiff's legal mail. (DN 106-6, PageID #: 726-28). He avers that clearly marked legal mail is given to an inmate to open in a deputy's presence and that, when mail is not clearly marked, he contacts the attorney's office before delivering it under the same procedure. (*Id.*, PageID #: 726-27). Finch acknowledges that some of Plaintiff's mail was not correctly marked but avers that he verified the sender and delivered the mail for Plaintiff to open. (*Id.*, PageID #: 727). As to the January 18, 2023, grievance, Finch avers that the letter arrived two business days after its postmark because the intervening days included a weekend and federal holiday and that Plaintiff opened the envelope himself in the presence of Finch and another deputy. (*Id.*, PageID #: 727-28; DN 98-9, PageID #: 609). MCDC Jailer J.J. Scarborough further avers that Petty and Plaintiff never shared a cell or pod and only exchanged cells on the same date and that Allen shared a cell with Plaintiff only from April 27 through May 27, 2023. (DN 106-13, PageID #: 822-23). Defendants maintain that those housing records undermine the witnesses' accounts of incidents occurring outside those periods. (*Id.*).

*2. First Amendment Free-Exercise and RLUIPA Claims*

Plaintiff alleges that Finch confiscated and discarded his Bible, denied scheduled visits from priests and pastors, restricted his attendance at religious services, and interfered with religious correspondence. (DN 25, PageID #: 171; DN 98-1, PageID #: 548-50). Thomas Dollarhyde, a fellow inmate, avers that, in November 2023, he saw Finch take Plaintiff's Bible, tell Plaintiff that he did not need it, and place it in a trash bag despite Plaintiff's request that it be returned. (DN 98-6, PageID #: 585). Inmates Donnie Allen and Tyler Petty similarly state that they saw Finch

take or discard Plaintiff's Bible and restrict Plaintiff's attendance at religious services, while Crouch, Plaintiff's mother, avers that she repeatedly contacted jail personnel in an unsuccessful attempt to have the Bible returned. (*Id.*, PageID #: 586-89). Plaintiff maintains that electronic access to religious material on shared tablets was not an adequate substitute for his Bible and did not permit him to receive Catholic sacraments or meet privately with clergy. (DN 98-1, PageID #: 548-50).

Finch disputes that he substantially burdened Plaintiff's religious exercise. He avers that, during Plaintiff's incarceration, physical books were prohibited in inmate cells and religious texts were available on electronic tablets. (DN 106-6, PageID #: 728). Finch maintains that, if Plaintiff possessed a physical Bible, it would have been treated as contraband and placed with Plaintiff's property rather than discarded. (*Id.*). He also avers that he does not recall turning away a clergy visit and that a visit could have been restricted if Plaintiff was in disciplinary status. (DN 98-7, PageID #: 596-97). Finch further contends that Plaintiff's request history reflects regular access to religious material on the tablets and that Plaintiff has produced no independent record of a scheduled clergy visit that Finch denied. (DN 106, PageID #: 697-98).

Finch also challenges the affidavits submitted in support of the religious-exercise claims. Jailer Scarborough avers that Dollarhyde could not have witnessed Finch discard Plaintiff's Bible in November 2023 because Dollarhyde was permanently released from MCDC on March 30, 2023, and had not shared a cell or pod with Plaintiff since December 23, 2022. (DN 106-13, PageID #: 821-22). Jailer Scarborough further avers that Tristen Wills was housed with Plaintiff only from March 22 through May 30, 2023, and that Donnie Allen shared a cell with Plaintiff only from April 27 through May 27, 2023. (*Id.*, PageID #: 822-23). Defendants argue that these housing records contradict the witnesses' statements about incidents occurring outside those periods. (*Id.*).

*C. Defendant Rebecca Webster: First Amendment Legal-Mail Claim*

Plaintiff alleges that Webster opened legal mail outside his presence, delayed or misplaced outgoing court mail, and prevented him from obtaining copies and notarizations needed for court filings. (DN 98-1, PageID #: 550-53). In an April 24, 2024, grievance, Plaintiff alleged that he returned two notices of appeal to the Meade Circuit Court Clerk, that Webster told him jail staff had misplaced the envelope, and that the Clerk later located it after a search. (DN 98-9, PageID #: 614). Plaintiff also submitted requests and grievances asserting that Webster refused or delayed copies of proposed court filings and denied access to the in-house notary. (*Id.*, PageID #: 610-12, 615). Petty avers that he saw Webster deliver Plaintiff's legal mail already opened and heard Plaintiff question Webster about mail that was missing and later found, while Allen and Crouch similarly state that Webster refused copies or notarizations. (DN 98-6, PageID #: 586-89).

Webster denies opening or losing Plaintiff's legal mail. She avers that she located only one grievance concerning allegedly missing outgoing mail, the April 24, 2024, grievance, and denies telling Plaintiff that jail staff had misplaced the envelope. (DN 106-5, PageID #: 721-22). Webster emphasizes that Plaintiff's grievance itself avers that the Clerk located the envelope and maintains that the mail was delivered to the court rather than lost. (*Id.*). Webster also denies refusing copies or notarizations and avers that she was not required to provide notary services to inmates, who could use private counsel or arrange for an outside notary. (DN 98-10, PageID #: 623-24). Webster also relies on Scarborough's affidavit that Petty and Plaintiff never shared a cell or pod and that Allen shared a cell with Plaintiff only from April 27 through May 27, 2023. (DN 106-13, PageID #: 822-23). Webster contends that the housing records undermine the witnesses' accounts to the extent those accounts describe events outside the periods in which the witnesses were housed near Plaintiff. (*Id.*).

*D. Defendant Meade County: Failure-to-Train Claim*

Plaintiff contends that Meade County failed to train MCDC employees concerning inmates' medical care, mental-health care, religious exercise, and legal mail. He relies on Meade County's interrogatory answers showing that MCDC's annual training appropriation was $7,500.00 in 2022 and $4,000.00 for the 2025-2026 period. (DN 98-12, PageID #: 639). Plaintiff also emphasizes that Meade County generally identified state-mandated training under Title 501 of the Kentucky Administrative Regulations rather than identifying training specifically directed to the constitutional violations alleged in this case. (*Id.*, PageID #: 642-45). Plaintiff therefore maintains that the absence of more specific training caused the alleged actions of Finch, Brown, and Webster. (DN 98-1, PageID #: 553-57).

Meade County denies that its training was inadequate. Its interrogatory answers state that detention-center training is mandated by the Commonwealth under Title 501 of the Kentucky Administrative Regulations, that Jailer Scarborough is responsible for overseeing MCDC policies and training, and that Department of Corrections training is provided through Crimcast. (DN 98-12, PageID #: 639-44). Jailer Scarborough avers that he reviewed the employment and training records of Finch, Brown, and Webster, that each Defendant satisfied the Commonwealth's training requirements, and that their certification and training records are attached to his affidavit. (DN 106-13, PageID #: 821). Meade County maintains that the record reflects existing policies and completed trainings addressing legal mail, religious practice, medical care, and employee duties rather than a county policy or custom of failing to train. (DN 106, PageID #: 691-92, 705).

**IV.**

*A. Fourteenth Amendment Deliberate-Indifference Hernia Claim*

Pretrial detainees enjoy a "right to adequate medical care" under the Fourteenth Amendment. *Downard for Est. of Downard v. Martin*, 968 F.3d 594, 600 (6th Cir. 2020) (quoting *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005)). A government official violates this right by acting with "deliberate indifference" to the detainee's "serious medical needs." *Id*. (quoting *Estelle v. Gamble*, 429 U.S. 97, 104, (1976)). Mirroring the Eighth Amendment, this deliberate-indifference inquiry contains both an objective and subjective component. *Id*. Accordingly, a plaintiff can make out a deliberate-indifference claim under the Fourteenth Amendment by first alleging that the detainee's medical need was "sufficiently serious." *Id*. (citing *Farmer v. Brennan*, 511 U.S. 825, 834, (1994)) (detailing the objective component). Second, under prior caselaw, the plaintiff had to show that the official "subjectively perceived facts from which to infer substantial risk to the [detainee], that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001); *Parsons v. Caruso*, 491 F. App'x 597, 602 (6th Cir. 2012). This presents a high bar, as "[i]t is not enough that an official 'fail[s] to alleviate a significant risk that he should have perceived but did not.'" *Parsons*, 491 F. App'x at 602 (quoting *Farmer*, 511 U.S. at 838). In response to recent Supreme Court precedent, however, the Sixth Circuit has modified the subjective component of the deliberate-indifference inquiry for pretrial detainees. *See Helphenstine v. Lewis Cnty.*, 60 F.4th 305, 316-17 (6th Cir. 2023) (explaining the divergence in the Fourteenth and Eighth Amendment analysis articulated in *Brawner v. Scott Cnty.*, 14 F.4th 585 (6th Cir. 2021), in response to *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)).

After *Brawner*, the subjective element has been modified to "lower the subjective component from actual knowledge to recklessness." *Id*. To, a plaintiff making out a deliberate-indifference claim under the Fourteenth Amendment must now show: (1) that the detainee possessed a sufficiently serious medical need; and (2) that the officer "acted deliberately (not accidentally), [and] also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Id*. at 317 (quoting *Brawner*, 14 F.4th at 596) (alteration in original). "A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Grote v. Kenton Cnty., Ky.,* 85 F.4th 397, 405 (6th Cir. 2023) (internal quotation omitted).

In this instance, the record reflects that the day prior to Plaintiff being lodged in the MCDC, he was seen in the emergency room of Baptist Health Hardin based on a complaint of upper abdomen pain. (DN 106-10). While being examined at Baptist Health Hardin, an x-ray was conducted with the provider noting that "[n]o new consolidations or pleural effusions are observed. A stable granuloma is noted in the left lung. The cardiac silhouette and mediastinum are unchanged. No definitive acute osseous abnormalities are seen on this single view." (*Id*., PageID #: 747). Notably, this x-ray was compared to a similar chest x-ray completed nearly a year prior. (*Id*.). While Plaintiff alerted Defendant Brown that he had a hernia during his initially booking into the MCDC, neither the x-ray records taken from the previous two years displayed a hernia. However, on February 18, 2022, Plaintiff requested to see a doctor regarding his hernia. (DN 106-12, PageID #: 778). On February 23, 2022, APRN Roy Washington examined Plaintiff and concluded that Plaintiff had a stable hiatal hernia that will be monitored. (*Id*.). Notably, Plaintiff

did not make another medical grievance for over a year until August 9, 2023. (*Id.*). At that point, he was proscribed Ibuprofen for the pain. (*Id.*).

At most, Plaintiff's allegations amount to disagreements regarding the course of care that he has received, as he has neither pointed out that he possessed a sufficiently serious medical need, nor that either Defendant acted deliberately in the face of an unjustifiably high risk of harm toward Plaintiff. Typically, a disagreement with a medical provider's medical judgment is insufficient to establish a deliberate-indifference claim. *See Rhinehart v. Scutt*, 894 F.3d 721, 740 (6th Cir. 2018). Further, even if Plaintiff could show that he received constitutionally inadequate medical care, he has offered no expert medical evidence demonstrating that an alleged inadequate treatment caused him injury, which is fatal to his claims. *See King v. Alexander*, 574 F. App'x 603, 606 (6th Cir. 2014) (providing that "failure to provide medical expert testimony to establish a causal link between injury and the allegedly inadequate treatment thus dooms the deliberate indifference claim.")).

As Plaintiff has not established the requisite elements to support a deliberate-indifference claim, nor has Plaintiff provided verifying medical evidence linking the supposed inadequate treatment with his injury, Defendant Brown is entitled to summary judgment on Plaintiff's deliberate-indifference claim with regard to the treatment of his hernia.

*B. Fourteenth Amendment Deliberate-Indifference Mental Health Claim*

The legal standard for a Fourteenth Amendment deliberate-indifference to Plaintiff's mental health claim utilizes the same standard as the above analysis regarding Plaintiff's Fourteenth Amendment deliberate-indifference to serious medical needs claim; accordingly, the Court readopts the above legal standard and will turn to analysis.

Here, Plaintiff contends that Defendant Brown was deliberately indifferent to his mental health needs by virtue of changing the dosage of Plaintiff's "mental health meds" without warning. (DN 1, PageID #: 4). The record reflects that Plaintiff requested a lower dosage regarding his mental health medication. For instance, on April 9, 2022, Plaintiff provided in a medical request: "[h]ello. I wanted to touch base about my anxiety medicine and conversation we had a while back about taking my meds with food. . . . I'd like to cut down to 2 pills a day as we talked about." (DN 98-4, PageID #: 568). As Plaintiff requested a lower dosage, it is inconceivable that the lowering of the dosage could amount to a deliberate indifference claim based on a Defendant changing dosages without Plaintiff's knowledge. Thus, as Plaintiff cannot support an argument that the care he received amounted to a constitutional violation based on the dosages being changed without his knowledge, his complaint boils down to a disagreement regarding medical care. As provided for above, *Rhinehart* stands for the proposition that mere disagreements regarding medical care cannot sustain a deliberate indifference claim. Further, Plaintiff has not put forward verifying medical evidence or testimony supporting a deliberate-indifference claim. Accordingly, Plaintiff has failed to meet his burden of proof on this claim, and Defendant Brown is entitled to summary judgment on this claim.

### *C. First Amendment Legal-Mail Claim*

The First Amendment protects a prisoner's right to receive mail, but prison officials may impose restrictions on the receipt of mail that are reasonably related to security and other legitimate penological objectives. *See Sallier v. Brooks*, 343 F.3d 868, 873 (6th Cir. 2003). Courts ascribe particular significance to this right when "legal mail" is involved, granting special protection to "correspondence that impacts upon or has import for the prisoner's legal rights, the attorney-client

privilege, or the right of access to the courts." *Id.* at 874 (citing *Kensu v. Haigh*, 87 F.3d 172, 174 (6th Cir. 1996)); *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)).

"[P]rison officials who open and read incoming mail in an arbitrary and capricious fashion violate a prisoner's First Amendment rights." *Sallier*, 343 F.3d at 873-74 (citing *Parrish v. Johnson*, 800 F.2d 600, 604 (6th Cir. 1986)). With that being said, legitimate security or penological objectives may include opening a prisoner's mail "pursuant to a uniform and evenly applied policy with an eye to maintaining prison security." *Id.* (quoting *Lavado v. Keohane*, 992 F.2d 601, 607 (6th Cir. 1993)). But when the mail is "legal mail," the Court has a heightened concern with allowing prison officials uninhibited access, because a prison's security interests do not automatically supersede a prisoner's First Amendment right to receive correspondence that relates to the prisoner's legal rights, attorney-client privilege, or access to the courts. *Id*. at 874. In an effort to balance both the security interests of the prison and the First Amendment rights of the inmate, courts have approved prison policies that permit prison officials to open "legal mail" and inspect it for contraband in the presence of the prisoner. *Id.*; *see also Wolff v. McDonnell*, 418 U.S. 539, 575 (1974); *Knop v. Johnson*, 977 F.2d 996, 1012 (6th Cir. 1992). Accordingly, even constitutionally protected mail can be opened—but not read—by prison officials for the purpose of inspecting it for contraband.

Plaintiff has alleged that Finch and Webster lost and opened his legal mail. (DN 1, PageID #: 5-6). To support these allegations, Plaintiff relies on affidavits from inmates incarcerated with him and his mother. (DN 98-6). The affiants (Donnie Allen, Tyler Petty, and Teresa Crouch) provide in relevant part:

(i) Affidavit of Donnie Allen:

> Rebecca Webster refused to make Daniel copies of his court filing and refused to notarize it even though she is a notary and notarized my papers but refused him.

> Brandon Finch also refused to give Daniel an envelope to [] mail out a huge packet he had been working on for months, to the court, and refused otherwise to take it over to the clerk which was just down the hallway so he could file it on time.
> …
>
> (ii) Affidavit of Tyler Petty
>
> I saw, many times, Daniel Clemans was brought legal mail from Rebecca Webster and Brandon Finch, that was already opened. Daniel always asked why it was opened and told them he wanted a copy of the legal mail envelope for proof and they would never give it to him. Several times they threatened to take him to the Hole if he asked again about the envelope his legal mail came in. I am eye-witness to this, and eye-witness to his legal mail being from attorneys, or from the courts. Even my legal mail was always opened already when I received it. Daniel Clemans continuously asked them to not open his legal mail because he had a big trial coming up and Brandon Finch and Rebecca Webster are friends with the prosecutors in Meade County which is in the same building as the jail. Additionally, I saw Brandon Finch and Rebecca Webster be questioned by Daniel Clemans about missing Legal mail, and legal mail that was lost then found weeks later.
>
> (iii) Affidavit of Teresa Crouch
>
> Brandon Finch and Rebecca Webster continuously denied Daniel notaries and denied him any way to get his pro se Motions filed prior to the start of trial as no envelopes were big enough to mail them available on commissary. They would not copy or let me pick up the Motions either so I could file them on his behalf, all of which caused great harm in Daniel's case where he still today is trying to remedy.

(DN 98-8, PageID #: 585-89).

Plaintiff also points to a letter he mailed to the Meade Circuit Clerk on April 23, 2024, alleging that he had filed separate Notices of Appeal that had been allegedly lost by the jail. (DN 98-8). Notably, Defendants argue that there would be no need for Plaintiff to file any legal papers post-conviction as he was appointed legal counsel to represent him for his appeal to the Kentucky Supreme Court. (DN 106, PageID #: 694). With regard to Plaintiff's affiants, Defendants contend that the affiants' observations could not be true, because jail records show that Petty and Allen were not sharing a cell with Plaintiff during the events observed in each affidavit. (DN 106-13, PageID #: 822-23). For instance, jail cell-assignment histories support the conclusion that Petty

never shared a cell with Plaintiff, and Allen only shared a cell from late April through May of 2023. (DN 106-8, PageID #: 822-23). Lastly, it is unclear from what source Couch is pulling her information from, as she is certainly not incarcerated. As this Court has held previously, " Fed. R. Civ. P. 56(c)(4) requires that an affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Payne v. Louisville Metro Dep't of Corr.*, Civil Action No. 3:14-cv-P600-DJH, 2016 U.S. Dist. LEXIS 125358, at *8 (W.D. Ky. Sep. 14, 2016). Further, "consistent with that rule, courts have applied a strict personal knowledge requirement to affidavits or declaration submitted in summary judgment proceedings." *Id*.

Defendants take great care to explain that Plaintiff's affiants may not have shared a cell with Plaintiff; however, it is conceivable that Plaintiff's affiants could have personally witnessed the events in their affidavits even without sharing a cell with Plaintiff. The Sixth Circuit has held that a "[p]risoner's sworn affidavit, standing alone, may create a genuine dispute of material fact that forecloses summary judgment[.]" *Lamb v. Kendrick*, 52 F.4th 286, 296 (6th Cir. 2022). In this instance, Plaintiff has provided affidavits of other prisoners which aver generally that the affiants were eye-witnesses to Plaintiff's legal mail being delivered already opened. Further, Plaintiff himself has averred that Defendants opened his legal mail. (DN 1, PageID #: 5-6). At the summary judgment stage, a verified complaint may serve as an affidavit. *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008). As Defendants have denied opening Plaintiff's legal mail without being in his presence, there is a genuine dispute of material fact. (DN 106-5, PageID #: 722, DN 106-6, PageID #: 727-28). Thus, summary judgment is not appropriate for either party at this stage regarding Plaintiff's First Amendment legal mail claim against Defendants Finch and Webster.

*D. First Amendment Free-Exercise and RLUIPA Claims*

The First Amendment provides, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. "Prisoners retain the First Amendment right to the free exercise of their religion." *Hayes v. Tennessee.*, 424 F. App'x 546, 549 (6th Cir. 2011) (citing *Walker v. Mintzes*, 771 F.2d 920, 929 (6th Cir. 1985)). "A prisoner alleging that the actions of prison officials violate his religious beliefs must show that 'the belief or practice asserted is religious in the person's own scheme of things' and is 'sincerely held.'" *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (citation omitted). A practice will not be considered to infringe on a prisoner's free exercise unless it "places[s] a substantial burden on the observation of a central religious belief or practice . . . ." *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989); *see also Welch v. Spaulding*, 627 F. App'x 479, 485 (6th Cir. 2015) (McKeague, J., dissenting) ("To violate the First Amendment, the diet must impose a substantial burden on the inmate's exercise of religion."). "[T]he Supreme Court has made clear that the 'substantial burden' hurdle is high." *Living Water Church of God v. Charter Twp. Of Meridian*, 258 F. App'x 729, 734 (6th Cir. 2007). "[A] 'substantial burden' is a difficult threshold to cross." *Id*. at 736. "'[A] 'substantial burden' must place more than an inconvenience on religious exercise.'" *Id*. at 739 (quoting *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004)). A particular government action will not be considered a substantial burden merely because it "may make [the] religious exercise more expensive or difficult . . . ." *Id*. "If a prison regulation infringes on a sincerely held religious belief, it is valid only if it is 'reasonably related to legitimate penological interests.'" *Helm v. Allen*, No. 3:18-CV-P90-RGJ, 2020 U.S. Dist. LEXIS 42285, at *3 (W.D. Ky. Mar. 11, 2020) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). Courts are to give "substantial deference to the professional judgment of prison administrators,

who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

Similarly, the RLUIPA prohibits the governmental imposition of a "substantial burden on the religious exercise" of an inmate unless the government establishes that the burden furthers a "compelling governmental interest" through the "least restrictive means[.]" 42 U.S.C. § 2000cc-1(a); *Fox v. Washington*, 949 F.3d 270, 277 (6th Cir. 2020) ("RLUIPA provides greater protections than the First Amendment."). Under RLUIPA, a plaintiff must show "that the government substantially burdened [his] religious exercise." *Cavin v. Mich. Dep't of Corr.*, 927 F.3d 455, 458 (6th Cir. 2019). An action substantially burdens religion if "that action forced an individual to choose between 'following the precepts of [his] religion and forfeiting benefits' or when the action in question placed 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Barhite v. Caruso*, 377 F. App'x. 508, 511 (6th Cir. 2010) (quoting *Living Water Church of God*, 258 F. App'x at 734). Prison regulations or policies that substantially burden sincere religious practice will only be upheld if they further compelling government interests and are the least restrictive means of furthering those interests. 42 U.S.C. § 2000cc-1(a); *Koger v. Mohr*, 964 F.3d 532, 539 (6th Cir. 2020). Further, "[a] substantial burden stands in contrast to a *de minimus* burden on the free exercise of religion. Burdens that are less than substantial or isolated are not of constitutional dimension." *Kitchen v. Leach*, No. 1:17-cv-371, 2017 U.S. Dist. LEXIS 71144, at *15 (W.D. Mich. May 10, 2017) (collecting cases).

While RLUIPA gives prisoners stronger religious protections than the First Amendment, *Holt v. Hobbs*, 574 U.S. 352, 357 (2015), "[c]ourts must give 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to

maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Ackerman v. Washington*, 16 F.4th 170, 179-80 (6th Cir. 2021) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005)). "If a prison's regulations satisfy RLUIPA, they satisfy the First Amendment, but not the other way around." *Roberts v. Henderson Cnty.*, No. 4:21-CV-00078-JHM, 2022 U.S. Dist. LEXIS 199452, 2022 WL 16640015, at *3 (W.D. Ky. Nov. 2, 2022).

Plaintiff makes three general claims that his First Amendment right to free exercise of religion and/or rights under the RLUIPA were violated: (i) that Defendant Finch confiscated and threw away his Bible; (ii) that the prison tablets do not have the Catholic Bible on them/the tablets are not always accessible preventing him from exercising his religion; and (iii) he was denied visits with clergy.

Plaintiff's claims regarding his First Amendment free-exercise claims are thus:

> Plaintiff is and was a practicing Catholic-Christian. Defendant Finch confiscated and threw away Plaintiff's SOFT-COVER Bible, the heartstone and lifeline of a Christian's religion and well-being, arguably even more so when incarcerated. Additionally, Finch, many times, denied Plaintiff Clergy Visits (Priests and Pastors as witnesses) after Clergy had already set appointments AND showed up at the jail. Finch intercepted mail from Priests and Pastors to the Plaintiff. [Finch] also enforced policy which actually continuously and knowingly caus[ed] ongoing physical altercations regarding extremely limited access to religious materials (3-4 electronic devices during the day for up to 24 inmates).

(DN 26, PageID #: 191).

In Plaintiff's MSJ, he adds:

> Defendant Finch came into Plaintiff's cell and threw Plaintiffs Catholic Bible in the trash (APPENDIX FOUR, *supra*, eye-witnesses' AFFIDAVITS). Apparently, the Bible is now called "contraband" (APPENDIX FIVE: "Finch's Interrogatory Answers" - Answers 18 and 19) and now labeled via "interrogatory" as "confiscated" and "to be put in Plaintiffs property," though it never was. It was thrown in the trash along with other actual trash collected from the cells. Again, Plaintiff was a pretrial detainee and had the presumption of innocence where no "punishment" was justified, especially the sick act of throwing a Bible in the trash which NO juror would say is "reasonable" under ANY circumstance, whether pretrial detainee or post-conviction.

> Eye-witness inmates named in AFFIDAVITS will testify that many others also had and retained their Bible's and religious books openly in their cells, yet Finch did not take theirs. Finch ignores answering what "policy was implemented" "specifically regarding inmates' religious rights protections" (APPENDIX FIVE, supra, Answer 15 and 16) and OBJECTS to a "yes or no" question whether he (Finch) "Ever" took or confiscated an inmate's Bible (*Id*., Answer 17). Moreover, Plaintiffs mother called and talked to Finch about returning Plaintiff's Bible to him due to extreme stress and mental anguish Plaintiff had with no Bible to turn to in times (incarcerated) of most harsh spiritual, emotional and mental disturbance (APPENDIX FOUR, supra, Teresa Crouch AFFIDAVIT) simultaneously compounded by Defendant Brown's indifference to Plaintiffs Mental Health needs (supra). Finch now claims he "does not remember" talking to Plaintiffs mother, and states at the "time of booking" Plaintiff into MCDC there was a "policy" that Plaintiff would have to use an Ipad to access "all religious materials" (APPENDIX FIVE, supra, Answer 18). However, Finch's Interrogatory Answers 15 and 16 show no "policy" answer. As stated and cited above by Plaintiff, "Ipads" were provided as "3-4 tablets per 20+ inmates" and only during daytime hours. Notably, the "Ipad" aka "tablet" did not have the Catholic Bible on it at all. The Catholic Bible has far more content, teachings, interpretations and books within it than other religious denomination Bible's, all of which essential to the effective worship and practice of the Catholic Religion.
>
> Defendant Finch also many times turned away Clergy visits from Plaintiff, from Father Tuan and Pastor Don, and again one time from Father George. These Clergy visits were utterly important for Plaintiffs Catholic religion in order to receive "Sacraments" required to properly practice Plaintiffs religion (Communion of Host, Confessions, etc.). Defendant Finch claims "he does not recall" turning away these religious visitors (APPENDIX FIVE, supra, Answer 20) but blames Plaintiff for "possibly" being "in disciplinary" for Finch's reasoning for denying and turning away religious Clergy visits. Additionally, compounding on religion oppression by Finch, Mail and religious material sent to Plaintiff by the Church, Pastors and Clergy also disappeared and was never received after being sent to MCDC to Plaintiff. When confronted by this Mail-missing issue "from Clergy, Church and Pastors," Finch claims the "question does not make sense" to him! (APPENDIX FIVE, supra, Answer 21) and that incoming mail goes to the addressee on the envelope. However, several times mail was delivered from religious clergy-members to MCDC with tracking, yet Plaintiff never received it.
>
> There is no doubt that Finch at the very least "substantially burdened" Plaintiffs exercise of his religion violating Plaintiffs First and Fourteenth Equal Protection rights without any "reasonable penological interest" or "security concerns" to override such protections.

(DN 98-1, PageID #: 548-49).

Plaintiff allegations regarding his Bible being taken are supported by affidavits from fellow prisoners. (DN 98-6, PageID #: 585-89). Regardless, the Court need not turn to the evidence

found within the affidavits to adjudicate Plaintiff's claims because Plaintiff has not properly alleged that Defendant Finch's actions placed "substantial pressure on [Plaintiff] to modify his behavior and to violate his beliefs." At best, Plaintiff has alleged that his Bible was taken pursuant to MCDC policy and that he did not have access to a Catholic Bible for approximately a week.[1] For instance, the record reflects that on July 17, 2023, Plaintiff sent the following communication to jail staff:

> Since my earlier grievance of my religion Not being part of the "Religious Devotion" tab and being denied my Religion's Bible, I fully have to utilize the "Books" [app] to have access to at least some material of my religion; however, the "Books" [app] has been taken off last week and still not added back on for inmate use. I've already sent a request about this last week (was told it was an update causing the "Books" [app] to be gone) and have talked to several staff members trying to resolve this to no avail. Can the "Books" be added back on, or the Catholic Bible be added to the "Religious Devotion" [app] please, or can a Priest drop of a Catholic Bible for me? Religion is a big deal to me (and many others here) and is needed in my Every Day life. Let me know please.

(DN 98-9, PageID #: 605).

Jail staff replied two days later that "[t]here was an issue with the app that caused the company to pull it. We were notified and the problem was resolved within a few hours." (*Id.*). Similarly, on July 27, 2023, Plaintiff alerted jail staff that the "Law library [app] has not been working for several days now. The staff seems to know nothing about it as I've asked several of them to see when it will be fixed." (*Id.*). The same day, jail staff replied "[t]his is the first we are hearing about the Law Library. Nor you or anyone else in the building has sent a request about this issue. We have notified Combined to let them know." (*Id.*).

Thus, the record reflects that Plaintiff had access to "some" of his Religion's material; rather than all of it for at most ten days. Notably, "isolated or sporadic government or omission is

---

[1] The Sixth Circuit has held that a ban on hardcover books, including Bibles, does not violate the First Amendment. *See Dunlap v. Losey*, 40 F. App'x 41, 43 (6th Cir. 2002).

*de minimis* and does not constitute a 'substantial burden.'" *Greenberg v. Hill*, No. 2:07-CV-1076, 2009 U.S. Dist. LEXIS 28027, at *19 (S.D. Ohio Mar. 31, 2009) (citing *Dunlap*, 40 F. App'x at *43) (holding that the temporary deprivation of a bible, while making the practice of Plaintiff's religion more difficult, did not coerce him into action contrary to his beliefs and did not support a claim under the RLUIPA). Similarly, Plaintiff has alleged that Defendant Finch denied him visits with clergy in contravention of his catholic faith. (DN 26, PageID #: 190). However, just as Plaintiff's claims regarding the confiscation of his Bible and the lack of access of the Catholic Bible on the prison tablets were not supported by allegations that they forced Plaintiff to "choose between following the precepts of his religion and forfeiting benefits" or that the depravation placed "substantial pressure on [Plaintiff] to modify his behavior and to violate his beliefs," Plaintiff has not alleged that the denial of a clergy visit caused him to do so either. Accordingly, Plaintiff has failed to show that he was substantially burdened by Defendant Finch's actions; accordingly, Plaintiff's First-Amendment free-exercise claim and his RLUIPA claim fail.[2]

It is also important to note that Plaintiff's RLUIPA claim fails, as a matter of law, as he is seeking monetary damages for his claims and the RLUIPA does not allow for the recovery of monetary damages. *See Cavin v. Mich. Dep't of Corr*., 927 F.3d 455, 460 (6th Cir. 2019) (holding that RLUIPA does not authorize monetary judgments against officials in their individual capacity and § 1983 does not allow for damages that RLUIPA does not provide). In this instance, Plaintiff's complaints only seek monetary damages for the "jail staff" which Defendant Finch would be included in. (DN 1, PageID #: 8).[3] Further, while Plaintiff's complaint seeks injunctive relief, it does not seek injunctive relief pertinent to Plaintiff's religion claims. (*Id*.). However, to the extent

[2] The substantial burden test is identical in both the First Amendment free-exercise context, as well as the RLUIPA context; thus, a Plaintiff cannot succeed on either claim without properly showing that there was a substantial burden on their religion. *See Living Water Church of God*, 258 F.App'x at 733-34.
[3] Neither Plaintiff's Amended Complaint, not Second Amended Complaint add any further request for damages.

that Plaintiff may construe any of his requests as injunctive relief, which the RLUIPA can provide, it is not appropriate in this circumstance as Plaintiff is no longer held at the MCDC. *See Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010) (holding that inmate's RLUIPA claims and other claims for injunctive relief were moot because he had been transferred to a different facility).

Accordingly, Defendant Finch is entitled to summary judgment on Plaintiff's First Amendment free-exercise claim and RLUIPA claim.

*E. Meade County: Failure-to-Train Claim*

A Plaintiff who seeks to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60-61 (2011) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978)). Plaintiff may demonstrate that Meade County was deliberately-indifferent by showing that it either (1) "failed to act 'in response to repeated complaints of constitutional violations by its officers,' . . . such that it 'was clearly on notice that the training in this particular area was deficient and likely to cause injury,'" *Ouza v. City of Dearborn Heights, Mich.*, 969 F.3d 265, 287 (6th Cir. 2020) (quoting *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003)); or (2) failed to train its personnel when the need for training "[was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately-indifferent to the need." *Id*. (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

In a failure-to-train claim, Plaintiff's injury must be a "highly predictable consequence" of inadequate training. *See Connick*, 563 U.S. at 64 (internal citation omitted). "[F]ailure-to-train claims are notoriously difficult to prove." *Green v. Tennessee*, No. 3:17-CV-01293, 2020 U.S. Dist. LEXIS 218536, 2020 WL 6874946, at *6 (M.D. Tenn. Nov. 23, 2020). The Supreme Court has

held that a government entity's "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 60.

Here, Plaintiff alleges that Meade County is liable for both pattern and single-incident violations based on "its policies, customs, and funding decisions" which have "injured, damaged, and harm[ed] Plaintiff." (DN 37, PageID #: 238). Notably, Plaintiff does not specify what the pattern of incidents, nor single-incident violations are beyond providing that the specific allegations found in Plaintiff's complaints against the Defendants constitute a pattern of violations. (*Id.*, PageID #: 237-38). Plaintiff points to Meade County not providing any training in its Interrogatories Answers and a drop in funding between 2022 and 2025 as evidence that Meade County has failed to train its employees. (DN 98-1 PageID #: 553-54). Defendants point to the affidavit of Jailer Scarborough which provides numerous training certificates completed by Meade County employees. (DN 106-13, PageID #: 824-916). Plaintiff has not provided evidence of inadequate training; accordingly, Plaintiff has failed to establish a causal link between Meade County's alleged failure to train and any injury he has suffered. Accordingly, Meade County is entitled to summary judgment on this claim.

**V.**

For the reasons set forth above, **IT IS ORDERED** that Defendants' motion for summary judgment (DN 106) is **GRANTED IN PART AND DENIED IN PART** and Plaintiff's motion for summary judgment (DN 98) is **DENIED**. Thus, Plaintiff's First Amendment legal-mail claim against Defendants Finch and Webster remain. Further, Plaintiff's remaining claims are dismissed against all Defendants. The Clerk of Court is **DIRECTED** to terminate Defendants Amber Brown and Meade County as parties to this action.

Date: August 31, 2026

Joseph H. McKinley Jr., Senior Judge
United States District Court

cc: Plaintiff, *pro se*
Counsel of record
4414.016